IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**MARGO SETTLES, et al.,**

        *Plaintiffs,*

**v.**

**BRANDON M. SCOTT, et al.,**

        *Defendants*.

**Case No.: 1:25-cv-01838-SAG**

<u>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AND REQUEST FOR HEARING**</u>

Plaintiffs, Margo Settles and Liam Davis, by undersigned counsel, file this Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint, and state for causes as follows:

# TABLE OF CONTENTS

Table of Contents ............................................................................................................. i

Introduction ..................................................................................................................... 1

Background ....................................................................................................................... 2

   I.   Margo Settles ........................................................................................................ 2

   II.  Liam Davis ............................................................................................................ 3

Legal Standard ................................................................................................................. 5

Argument ........................................................................................................................... 6

   I.   Plaintiffs' State Law Claims for Violations of the Maryland Declaration of Rights (Count II) Are Not Subject to the *Monell* Standard for Municipal Liability or Qualified Immunity for Mayor Scott. ...................................................................................... 6

   II.  Plaintiffs Sufficiently Pled that Their Terminations Were the Result of an Official Policy or Custom of the City ......................................................................................... 9

      A.  Plaintiffs' terminations were ordered by the final policymaker for the City—Mayor Scott. ................................................................................................... 10

      B.  Plaintiffs' terminations were the result of a persistent and widespread custom or practice of the City ............................................................................................... 15

   III.  Mayor Scott Is Not Entitled to Qualified Immunity. ......................................... 16

      A.  Fourth Circuit and Maryland law are clear about when to apply *Elrod/Branti* versus *Pickering* to alleged violations of public employees' First Amendment rights............. 18

      B.  Under *Elrod/Branti*, Mayor Scott violated Plaintiffs' clearly established right to associate for political purposes by terminating Plaintiffs' employment....................... 20

      C.  Under *Pickering*, Mayor Scott violated Plaintiffs' clearly established right to protected speech and/or expressive conduct by terminating Plaintiffs' employment. .................. 22

   IV.  Plaintiffs Sufficiently Pled that Their Terminations Violated the Clear Public Policy Allowing Public Employees to Engage in Political Activity and to Express Political Opinions. ............................................................................................................ 25

   V.  Plaintiff Davis Sufficiently Pled the Elements of His Tortious Interference Claim......... 28

Conclusion ....................................................................................................................... 30

Request for Hearing ....................................................................................................... 31

## INTRODUCTION

Plaintiffs Margo Settles and Liam Davis were dedicated employees of the City of Baltimore for over a decade. Their commitment to their communities and passion for public service led to them each deciding to run for City Council in the May 2024 Democratic Primary Election. Ultimately, Mrs. Settles and Mr. Davis each lost their bids for City Council.

Then, within six weeks of the election, without notice or explanation, the City terminated Mrs. Settles and Mr. Davis from their municipal jobs. In fact, Mayor Brandon Scott ordered Plaintiffs' terminations because of their associations with the Mayor's political opponents, and for speaking about campaign issues and candidates, during their campaigns for City Council. Thus, in retaliating against Plaintiffs by terminating their employment due to their perceived support of and by the Mayor's political opponents, and due to their protected political speech, Mayor Scott and the City violated Plaintiffs' rights protected by the First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights. Additionally, Mayor Scott and the City wrongfully terminated Plaintiffs' employment in violation of Maryland's public policy of guaranteeing public employees the right to engage in political activity and political speech.

Plaintiffs filed their Complaint in the Circuit Court for Baltimore City, alleging four counts against Mayor Scott (individually and in his official capacity as Mayor of Baltimore) and the Mayor and City Council of Baltimore (the "City"). Count I alleges violation of the First and Fourteenth Amendments under 42 U.S.C. § 1983; Count II alleges violation of Article 40 of the Maryland Declaration of Rights; Count III alleges wrongful termination in violation of public policy; and Count IV (brought by Mr. Davis only) alleges tortious interference with prospective business relations. Defendants removed the case to this Court.

Defendants seek dismissal of Plaintiffs' Complaint in its entirety. However, they present

no colorable argument for dismissal of Plaintiffs' state constitutional claim (Count II), instead relying on doctrines only applicable to federal claims under § 1983. Therefore, at a minimum, Defendants' Motion must be denied with respect to Count II.

For the remaining claims, Defendants' arguments are easily rejected on the merits. For Count I, the City is liable because Plaintiffs' terminations were the result of an official policy or custom of the City—namely, terminating employees whom the Mayor perceived as being disloyal to him. Additionally, Mayor Scott is not entitled to qualified immunity because Plaintiffs' rights to associate for political purposes and to speak about political issues and candidates were clearly established at the time of their terminations. For Count III, Plaintiffs have alleged facts sufficient to show that their terminations violated Maryland's public policy guaranteeing public employees the right to engage in political activity and political speech. For Count IV, Mr. Davis has alleged facts sufficient to establish each of the elements of his tortious interference claim, including that Defendants acted with an "unlawful purpose" and through "improper means." Therefore, Defendants' Motion to Dismiss must be denied as to all counts.

## **BACKGROUND**

### I.    **Margo Settles**

Mrs. Settles was Chief of the City's Employee Assistance Program ("EAP") in the Department of Human Resources ("DHR") from July 1, 2013 through her termination on June 28, 2024. Compl. ¶¶ 30, 53. She reported to Lindsay Wines, Assistant Deputy Director of Administration, and Quinton Herbert, then-Director and Chief Human Capital Officer for DHR. Compl. ¶ 32. Mrs. Settles consistently received excellent performance reviews from her supervisors, including one just two days before her termination. Compl. ¶¶ 51–52, 58.

In 2023, Mrs. Settles began her campaign for City Council, District 3 as a Democratic Party candidate. Compl. ¶ 43. She adhered to all applicable City policies regarding conducting

campaign activity during her personal time, not during work hours. Compl. ¶ 45. Mrs. Settles'
campaign received financial support from then-Councilman Eric T. Costello, who was a vocal
supporter of former Mayor Sheila Dixon's attempt to unseat Mayor Scott in the 2024 Democratic
Primary election. Compl. ¶ 6. In April 2024, Mrs. Settles and former Mayor Dixon discussed
mutual support for each other's campaigns. Compl. ¶ 48. Their volunteers distributed each
other's flyers and they displayed their ads on the same advertisement truck. *Id.* On May 14,
2024, Mrs. Settles lost her bid for City Council. Compl. ¶ 49.

Six weeks later, on June 28, 2024, the City terminated Mrs. Settles' employment without
notice or explanation. Compl. ¶ 53. The only justification provided by the City was that Mrs.
Settles' "employment with the City of Baltimore is at will." *Id.* A month later, Mrs. Settles
learned that, during a meeting attended by then-Deputy Mayor Simone Johnson shortly after the
primary election, the Mayor's Office, on behalf of Mayor Scott, gave an instruction to terminate
Mrs. Settles due to her association with the Mayor's political opponents during her campaign for
City Council. Compl. ¶ 55. Mrs. Settles also learned that, during the same meeting, the Mayor's
Office, on behalf of Mayor Scott, gave a similar instruction regarding "the guy in
transportation," referring to Mr. Davis. *Id.*

Mrs. Settles' abrupt and public termination has resulted in severe and lasting negative
effects. Compl. ¶ 60. As a result of Defendants' conduct, Mrs. Settles has suffered, and continues
to suffer, financial hardship, reputational harm, and severe emotional distress. Compl. ¶¶ 61–67.

## II.    Liam Davis

Mr. Davis began his career for the City in September 2011 as a Community Liaison
working for then-City Council President Bernad C. "Jack" Young. Compl. ¶ 69. In April 2019,
Mr. Davis accepted an offer as Legislative Affairs Manager for the City's Department of
Transportation ("DOT"), where he worked until his termination on June 21, 2024. Compl. ¶¶ 70,

95, 97. Throughout his tenure, Mr. Davis reported to Chief of Staff Veobia Akilo. Compl. ¶ 79. His next-level supervisor was then-Director of DOT Steve Sharkey, who was replaced by then-Director of DOT Corren Johnson prior to his termination. Compl. ¶¶ 79, 97.

Mr. Davis decided to run for City Council, District 1 in 2022 and formally announced his candidacy in April 2023. Compl. ¶¶ 77, 79, 81, 86. He adhered to all applicable City policies regarding conducting campaign activity during his personal time, not during work hours. Compl. ¶¶ 78–80, 84–86. His campaign received financial support from then-Councilman Costello, who is also a close personal friend of Mr. Davis. Compl. ¶¶ 6–7. During his campaign, Mr. Davis stated that he was "neutral" in the mayor's race. Compl. ¶¶ 6, 100. On May 14, 2024, Mr. Davis lost his bid for City Council. Compl. ¶ 90.

Five weeks later, on June 21, 2024, the City terminated Mr. Davis's employment without notice or explanation. Compl. ¶¶ 95, 97. The only justification provided in his termination notice was that his "services are no longer required." Compl. ¶ 97. Later that day, Mr. Davis learned that, during his campaign, the Mayor's Office had overheard Mr. Davis say that he was "neutral" in the Mayor's race and that this "didn't sit well with" Mayor Scott. Compl. ¶ 100.

Following his abrupt termination, Mr. Davis immediately began applying for jobs. Compl. ¶ 102. Through his contacts, he received a job offer from the civil engineering company RK&K. Compl. ¶ 103. RK&K's Director of Rail/Transit, Henry Kay, told Mr. Davis that, given his termination by the City and RK&K's existing contracts with the City, he wanted to make sure that hiring Mr. Davis would not cause any issues. Compl. ¶ 104. A few days later, after Mr. Kay's contact with the City flagged Mr. Davis's potential hiring with RK&K to the Mayor's Office, Mr. Kay informed Mr. Davis that the Mayor's Office had "said no go" about his hiring, effectively blocking Mr. Davis's prospective employment with RK&K. Compl. ¶¶ 104–05.

As a result of Defendants' unlawful conduct, Mr. Davis has yet to find permanent

alternative employment. Compl. ¶ 106. He has suffered and continues to suffer financial

hardship, reputational harm, and mental anguish. Compl. ¶¶ 107–10.

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)

is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the

merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th

Cir. 2016) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). "Whether

a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed.

R. Civ. P. 8(a)(2)[,]" *Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 709 (D. Md. 2013),

which provides that a complaint must contain "a short and plain statement of the claim showing

that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To satisfy the minimal

requirements of Rule 8(a)(2), the complaint must set forth 'enough factual matter (taken as true)

to suggest' a cognizable cause of action, 'even if … [the] actual proof of those facts is

improbable and … recovery is very remote and unlikely.'" *Murphy-Taylor*, 968 F. Supp. 2d at

709 (alterations in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

"In reviewing a 12(b)(6) motion, a court 'must accept as true all of the factual allegations

contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor

of the plaintiff.'" *Id.* at 710 (alteration in original) (quoting *E.I. du Pont de Nemours & Co. v.

Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)). "To survive a motion to dismiss, a

complaint must simply contain factual allegations that 'raise a right to relief above the

speculative level, thereby nudging [the] claims across the line from conceivable to plausible.'"

*Bazemore v. Best Buy*, 957 F.3d 195, 200 (4th Cir. 2020) (alteration in original) (quoting *Hately

v. Watts*, 917 F.3d 770, 782 (4th Cir. 2019)). "Accordingly, a Rule 12(b)(6) motion should only

be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and

drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears

certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to

relief." *Edwards*, 178 F.3d at 244; *see also Murphy-Taylor*, 968 F. Supp. 2d at 710 ("Dismissal

under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or

sufficient facts to support a cognizable legal theory." (quoting *Hartmann v. Cal. Dep't of Corr.

& Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013))).

## ARGUMENT

I.  **Plaintiffs' State Law Claims for Violations of the Maryland Declaration of Rights (Count II) Are Not Subject to the *Monell* Standard for Municipal Liability or Qualified Immunity for Mayor Scott.**

In their Memorandum, Defendants analyze Counts I and II as if they are identical.

Specifically, Defendants assert that "Counts I and II must be dismissed against the [City]

because Plaintiffs cannot show a policy or custom that led to their termination," Def. Mem. 4,

that "Counts I and II against Brandon M. Scott in his official capacity must be dismissed as

duplicative" of Plaintiffs' claims against the City, Def. Mem. 6, and that "Counts I and II against

Brandon M. Scott in his individual capacity must be dismissed because even if he did control

Plaintiffs' firing, he is entitled to qualified immunity." *Id.* For each of these arguments,

Defendants make no distinction between Plaintiffs' claim arising under the U.S. Constitution

(Count I) and that arising under the Maryland Declaration of Rights (Count II).

"Th[ese] argument[s] [are] based upon a faulty assumption that Maryland constitutional

tort law tracks the procedure and standards of the federal Civil Rights Act." *Prince George's

Cty. v. Longtin*, 419 Md. 450, 495 (2011). However, the Maryland courts have made clear that

"Maryland's constitutional protections require more from public officials and municipalities than

§ 1983, and the rules and procedures of applying them are divergent from the federal rules." *Id.*

at 496. While it is true "that the *freedoms* protected by Article 40 of the Maryland Declaration of Rights have been interpreted by [the Supreme Court of Maryland] to be co-extensive with the freedoms protected by the First Amendment," *Jakanna Woodworks v. Montgomery Cty.*, 344 Md. 584, 595 (1997) (emphasis added), "the rules relating to *redress* for violation of those rights are very different." *DiPino v. Davis*, 354 Md. 18, 45 (1999) (emphasis added). Maryland courts "have consistently declined to adopt the Federal approach." *Id.*

Specifically, with respect to Defendants' first argument regarding *Monell* liability, the Supreme Court of Maryland has made "clear, as a matter of common law, that local governmental entities do, indeed, have *respondeat superior* liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of employment." *Id.* at 51–52. Thus, unlike claims for violations of the Federal Constitution under § 1983, claims against a municipality for violations of the Maryland Declaration of Rights do not require that "the violation was 'caused' by the municipality." *See Longtin*, 419 Md. at 493 (discussing *Monell*). For the state constitutional claims, all that is required to impose liability on the municipality is that the violation was committed by a municipal "agent[] [or] employee[] within the scope of employment." *DiPino*, 354 Md. at 52. Plaintiffs have sufficiently alleged that this occurred, *see* Compl. ¶¶ 16, 121, and Defendants have not argued otherwise. Therefore, Plaintiffs' state constitutional tort claim against the City should not be dismissed.

In their second argument, Defendants assert that Counts I and II against Brandon Scott in his official capacity must be dismissed because they are duplicative of the claims against the City. Def. Mem. 6. However, Maryland law permits plaintiffs to bring claims against both the local government entity and the local government official in his official capacity, even though the claims are treated as essentially identical. *See Ashton v. Brown*, 339 Md. 70, 115 (1995)

(recognizing that "[a]n official capacity suit is, in all respects other than name, to be treated as a suit against the [governmental] entity," and then allowing plaintiffs to maintain their suits against both the city and the city officials in their official capacities). Therefore, Plaintiffs' state constitutional tort claim against Mayor Scott in his official capacity should not be dismissed.

Finally, Defendants argue that Counts I and II against Mayor Scott in his individual capacity must be dismissed because he is entitled to qualified immunity. Def. Mem. 6. Again, this argument is premised upon an erroneous assumption that the federal jurisprudence applicable to § 1983 claims similarly applies to Maryland constitutional claims. But the Supreme Court of Maryland has made clear that "[a] state public official alleged to have violated … any article of the Maryland Declaration of Rights[] is not entitled to qualified immunity." *Okwa v. Harper*, 360 Md. 161, 201 (2000); *see also Rovin v. State*, 488 Md. 144, 188 (2024) ("Under the State Constitution, governmental officials do not have qualified immunity when a violation is established."); *Lee v. Cline*, 384 Md. 245, 258 (2004) ("[T]his Court has consistently held that Maryland common law qualified immunity in tort suits, for public *officials* performing *discretionary* acts, has no application in tort actions based upon alleged violations of state constitutional rights or tort actions based upon most so-called 'intentional torts.'"). The same is true of local government officials. *See Longtin*, 419 Md. at 495.

Accordingly, for purposes of their state constitutional tort claim against Mayor Scott in his individual capacity, Plaintiffs do not need to establish that Mayor Scott's actions were objectively unreasonable (although they were) or that the constitutional right that was violated was clearly established at the time of the violation (although it was). Instead, all that is required is that Mayor Scott, acting under color of state law, violated Plaintiffs' rights guaranteed by Article 40 of the Maryland Declaration of Rights. Plaintiffs have sufficiently alleged that this is

the case, *see* Compl. ¶¶ 16, 113, and Defendants have not argued otherwise. Therefore, Plaintiffs' state constitutional tort claim against Mayor Scott in his individual capacity should not be dismissed.

In summary, each of Defendants' arguments for dismissal of Count II, alleging a violation of the Maryland Declaration of Rights, are premised upon the faulty assumption that these claims are subject to the federal jurisprudence that applies to federal claims under § 1983. The Maryland courts have made clear that this is not so, specifically declining to adopt either the *Monell* standard of liability for municipalities or the doctrine of qualified immunity for public officials. Therefore, even if Defendants' arguments were substantively correct as to Count I (they are not), they are still wholly inapplicable to Count II and thus would not provide a basis for the Court to dismiss any of the Defendants as to Count II. As Defendants have not put forth any other basis for dismissing Count II, the Motion to Dismiss must be denied as to that Count.

## II. Plaintiffs Sufficiently Pled that Their Terminations Were the Result of an Official Policy or Custom of the City.

Defendants assert that Count I[1] must be dismissed against the City "because Plaintiffs cannot *show* a policy or custom that led to their termination." Def. Mem. 4 (emphasis added); *see also id.* ("if Plaintiffs can *prove* they were deprived of their federal rights, they must then *prove* that the deprivation was done 'through an official policy or custom.'" (emphasis added)); *id.* at 5 ("assuming *arguendo* that Plaintiffs can *prove* that they were deprived of a federal statutory or constitutional right, the only way that Plaintiffs can *establish* a policy or custom would be through a *showing* that the decision to fire them was made by one with 'final policymaking authority.'" (emphasis added)). As an initial matter, this is not the applicable legal standard for a

---

[1] Defendants make this argument with respect to Counts I and II. As explained in Part I, *supra*, Defendants' argument is wholly inapplicable to Count II. Therefore, Plaintiffs will respond substantively to Defendants' argument only as it pertains to Count I.

motion to dismiss. At this stage, Plaintiffs are not required to "show," "establish," or "prove" anything. Instead, "[t]o withstand a motion to dismiss, a § 1983 plaintiff must *allege* facts that, 'if true, show a violation of clearly established constitutional rights.'" *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 169 (4th Cir. 2016) (emphasis added) (quoting *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 331 (4th Cir. 2009)).

Here, Plaintiffs have sufficiently alleged that their terminations were the result of an official policy or custom of the City. As Defendants note, "municipal liability under Section 1983 attaches only to 'action [taken] pursuant to official municipal policy of some nature[.]'" *Hunter v. Town of Mocksville*, 897 F.3d 538, 554 (4th Cir. 2018) (first alteration in original) (quoting *Pembaur v. City of Cinncinati*, 475 U.S. 469, 477 (1986)). But "the concept of 'official policy' for purposes of Section 1983 extends beyond formal ordinances and policies[.]" *Id.* Thus,

> "A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law."

*Misjuns v. City of Lynchburg*, 139 F.4th 378, 2025 U.S. App. LEXIS 13786, at *10 (4th Cir. 2025) (quoting *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)). Plaintiffs have alleged facts that, if true, establish an official policy or custom under the second and fourth prongs of *Lytle*.

### A. Plaintiffs' terminations were ordered by the final policymaker for the City— Mayor Scott.

First, Plaintiffs allege that their "terminations were ordered by the final policymaker for the City—namely, Mayor Scott." Compl. ¶ 115. "[I]n assessing whether a municipality may be held liable for the constitutional or statutory violations of their decisionmakers, the touchstone inquiry is whether 'the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Hunter*, 897 F.3d at 554–55 (quoting *Liverman v. City of*

*Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016)). "A 'final policymaker' is a person who has 'the responsibility and authority to implement final municipal policy with respect to a particular course of action.'" *Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 537 (D. Md. 2020) (quoting *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)).

Here, Plaintiffs specifically allege that "Mayor Scott ordered Mrs. Settles' and Mr. Davis's supervisors to sign their termination papers even though each of them had excellent performance reviews and their supervisors had no legitimate reason to terminate them." Compl. ¶ 8. Plaintiffs further allege "that, during a meeting attended by Deputy Mayor Simone Johnson, among others, shortly after the primary election, the Mayor's Office, on behalf of Mayor Scott, gave an instruction to terminate Mrs. Settles due to her association with the Mayor's political opponents during her campaign against Mr. Dorsey" and "that, during the same meeting, the Mayor's Office, on behalf of Mayor Scott, gave a similar instruction regarding 'the guy in transportation,' referring to Mr. Davis." Compl. ¶ 55. Additionally, Plaintiffs allege that then-DOT Director Corren "Johnson told Mr. Davis that she could not go into detail [about his termination], 'if you know what I mean.' Mr. Davis understood this to mean that his termination had been ordered by the Mayor's Office, on behalf of Mayor Scott." Compl. ¶ 99.

These allegations, if true, establish that Mayor Scott "possesses final authority to establish municipal policy with respect to" Plaintiffs' terminations. *See Hunter*, 897 F.3d at 554. Indeed, Mayor Scott ordered Plaintiffs' supervisors to terminate Plaintiffs, and Plaintiffs' supervisors did as they were instructed, even though Plaintiffs' supervisors did not want to do so. *See* Compl. ¶ 54 ("As her supervisors informed her of the termination, Mr. Herbert and Ms. Wines were both crying. Mr. Herbert told Mrs. Settles that informing her of her termination was 'the worst day of his professional career.'"); Compl. ¶ 97 ("Ms. Johnson immediately called Mr.

Davis and told him that anyone would be lucky to have him on their team. Ms. Johnson gave Mr. Davis her personal phone number for him to use as a reference for prospective employers."). Therefore, Plaintiffs have sufficiently alleged that their terminations were the result of "the decisions of a person with final policymaking authority" for the City such that the City can be held liable for the alleged constitutional violations.[2] *See Misjuns*, 139 F.4th 378, 2025 U.S. App. LEXIS 13786, at *10.

Defendants, relying on *Hunter*, argue that Plaintiffs' allegations are insufficient to establish that Mayor Scott had "final policymaking authority" with respect to Plaintiffs' terminations because the City Charter provides that the heads of the respective departments "shall have the sole power of appointment and removal of all … subordinate employees employed by them[.]" Charter of Baltimore City, Art. IV, § 7. Because the department heads "make ultimate hiring and firing decisions," Defendants assert that Mayor Scott "did not have the policymaking authority to do so" with respect to Plaintiffs' terminations. Def. Mem. 5–6. But *Hunter* specifically rejects such a result.

In *Hunter*, North Carolina state law vested the town board with discretion to "adopt or provide" personnel policies for town employees and empowered the town manager to appoint or remove all town employees in accordance with the town's personnel policies. *Id.* at 556. However, a town ordinance specifically delegated to the town manager the board's "statutory authority to set personnel policy for the Town." *Id.* Therefore, the town manager who fired the plaintiffs in violation of the First Amendment was acting as final policymaker for the town in doing so. *Id.* at 557; *see also id.* at 559 ("[O]ur holding rests on the Town Board's express

---

[2] Further evidence that Plaintiffs' terminations can fairly be imputed to the City is the fact that each of their Notice of Benefit Determinations from the Department of Labor stated that they were discharged "by Mayors Office" [sic]. *See* Compl. ¶ 57 (citing Ex. 3).

delegation to [the town manager] of final policymaking authority regarding personnel matters, rendering her termination of Plaintiffs the official policy of the Town.").

Here, Defendants argue that the City Charter's delegation of hiring and firing authority to the respective department heads is analogous to the Town of Mocksville's delegation of "statutory authority to *set personnel policy* for the Town" in *Hunter*. *See id.* at 556 (emphasis added). But *Hunter* makes clear that "there is a marked difference between 'the authority to make final *policy* [and] the authority to make final implementing *decisions*.'" *Hunter*, 897 F.3d at 555 (alteration in original) (quoting *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 966 (4th Cir. 1995)); *see also Misjuns*, 139 F.4th 378, 2025 U.S. App. LEXIS 13786, at *11 ("[T]he Supreme Court has explained that a 'County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy.'" (quoting *Pembaur*, 475 U.S. at 483 n.12)).

Indeed, in *Hunter*, after concluding that the town manager acted as the final policymaker pursuant to the express delegation of policymaking authority from the town, the court went on to hold that the police chief, who was the plaintiffs' direct supervisor, was not a final policymaker whose constitutional violations could be imputed to the town. *Id.* at 561. The court specifically noted that although the police chief "may have *discretion* to hire and fire employees, the discretion to hire and fire does not necessarily include responsibility for establishing related policy[.]" *Id.* (cleaned up) (quoting *Pembaur*, 475 U.S. at 483 n.12; *Greensboro Prof'l Fire Fighters Ass'n*, 64 F.3d at 966).

Similarly, here, while Mr. Herbert and Ms. Johnson may have had final authority to *implement* Plaintiffs' terminations, such authority "does not necessarily include responsibility for establishing related policy." *See id.* "Caselaw is clear that '[t]he fact that a particular official—

13

even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.'" *Misjuns*, 139 F.4th 378, 2025 U.S. App. LEXIS 13786, at *11 (quoting *Pembaur*, 475 U.S. at 482). Thus, the fact that the City Charter authorizes the respective department heads to appoint and remove their subordinate employees does not mean that the department heads have *policymaking* authority with respect to those personnel decisions.

Additionally, in *Greensboro Professional Fire Fighters Association* (on which *Hunter* relied), the Fourth Circuit held that "even though Fire Chief Jones may have had authority to determine whom to promote to captain and also to design the particular procedures to be used, he was not authorized to decide that promotional decisions could be made on the basis of an employee's union activity." *Greensboro Prof'l Fire Fighters Ass'n*, 64 F.3d at 966. Similarly, here, while Mr. Herbert and Ms. Johnson may have had discretion to make hiring and firing decisions, they were not authorized to decide that such decisions could be made on the basis of an employee's political activity or protected speech. *See id.* Only Mayor Scott, as the ultimate decisionmaker and policymaker for the City, could make such a policy:

> "If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly."

*Hunter*, 897 F.3d at 554 (quoting *Pembaur*, 475 U.S. at 481).

Plaintiffs allege that Mayor Scott made a policy of terminating City employees whom the Mayor perceived as being associated with his political opponents, Compl. ¶ 5, that Mayor Scott ordered the respective department heads with firing authority over the Plaintiffs to implement this policy, Compl. ¶¶ 8, 55, and that the respective department heads followed Mayor Scott's

orders, even though they did not want to terminate Plaintiffs. Compl. ¶¶ 54, 97. As department

heads, Plaintiffs' respective supervisors were subject to "remov[al] at pleasure" by the Mayor,

Charter of Baltimore City, Art. IV, § 6(c), and thus had little choice but to comply with the

Mayor's orders. Thus, Plaintiffs have sufficiently alleged that their terminations were the result

of decisions by a person with final policymaking authority for the City—namely, Mayor Scott.

### B. Plaintiffs' terminations were the result of a persistent and widespread custom or practice of the City.

Although not addressed in Defendants' Memorandum, Plaintiffs have also alleged facts

that, if true, establish that their terminations were the result of "a practice that is so persistent and

widespread as to constitute a custom or usage with the force of law," under the fourth prong of

*Lytle. See Misjuns*, 139 F.4th 378, 2025 U.S. App. LEXIS 13786, at *10 (quoting *Lytle*, 326 F.3d

at 471). "To prove a custom or practice using the fourth method, [plaintiffs] must show that 'a

pattern of comparable practices has become actually or constructively known to responsible

policymakers.'" *Howard v. City of Durham*, 68 F.4th 934, 952 (4th Cir. 2023) (quoting *Spell v.

McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987)). "To be liable, '(1) the municipality must have

"actual or constructive knowledge" of the custom and usage by its responsible policymakers, and

(2) there must be a failure by those policymakers, "as a matter of specific intent or deliberate

indifference," to correct or terminate the improper custom and usage.'" *Id.* (quoting *Randall v.

Prince George's Cty.*, 302 F.3d 188, 210 (4th Cir. 2002)).

Plaintiffs allege that they "were part of a group of City employees who were terminated

upon orders from Mayor Scott immediately following the May 2024 Primary Election due to

their association with the Mayor's political opponents." Compl. ¶ 9. Plaintiffs further allege that,

> in addition to Mrs. Settles and Mr. Davis, Mayor Scott also ordered the
> terminations of Andrew C. Freeman, then-Vice President of East Baltimore
> Development, Inc., and Kimberly Washington, then an operations manager for the
> Baltimore City Fire Department. Like Mrs. Settles and Mr. Davis, Mr. Freeman

and Ms. Washington "were associated with political actors who [supported former Mayor Sheila Dixon] and were openly critical of [Mayor] Scott."

Compl. ¶ 10 (alterations in original) (citations omitted). Finally, Plaintiffs allege that their "terminations resulted from the City's official policy, custom, or practice of terminating City employees whom the Mayor perceives as being associated with and/or supported by the Mayor's political opponents." Compl. ¶ 114.

These allegations, taken as true, establish that Plaintiffs' terminations were the result of "a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." *See Misjuns*, 139 F.4th 378, 2025 U.S. App. LEXIS 13786, at *10 (quoting *Lytle*, 326 F.3d at 471). Indeed, the practice of terminating City employees whom the Mayor perceives as being associated with his political opponents is certainly "actually or constructively known to responsible policymakers" because the Mayor himself is responsible for this policy. *See Howard*, 68 F.4th at 952. Thus, Plaintiffs have alleged facts sufficient to establish that (1) the City has actual or constructive knowledge of the custom by Mayor Scott, and (2) Mayor Scott, as the responsible policymaker, as a matter of specific intent, failed to correct or terminate the improper custom. *See id.*

Defendants have not put forth any argument to the contrary. Therefore, in addition to the "final policymaker" prong of *Lytle* discussed above, the "widespread custom or practice prong" of *Lytle* provides an independent basis for imposing liability on the City for the Plaintiffs' unlawful terminations.

## III.    Mayor Scott Is Not Entitled to Qualified Immunity.

Defendants assert that Count I[3] must be dismissed against Mayor Scott in his individual

---

[3] Defendants make this argument with respect to Counts I and II. As explained in Part I, *supra*, Defendants' argument is wholly inapplicable to Count II. Therefore, Plaintiffs will respond substantively to Defendants' argument only as it pertains to Count I.

capacity because, even if he violated Plaintiffs' First Amendment rights, he is entitled to qualified immunity. Qualified immunity is an affirmative defense that "shields government officials 'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Hunter*, 789 F.3d at 396 (quoting *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)). "To successfully avail themselves of qualified immunity, Defendants must show either that no constitutional violation occurred or that the right violated was not clearly established at the time it was violated." *Id.* "In analyzing whether the defendant has violated a constitutional right of the plaintiff, the court should identify the right 'at a high level of particularity.'" *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013) (quoting *Edwards*, 178 F.3d at 250). "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." *Durham v. Jones*, 737 F.3d 291, 299 (4th Cir. 2013) (quoting *Meyers v. Balt. Cty.*, 713 F.3d 723, 731 (4th Cir. 2013)).

In their Memorandum, Defendants do not argue that "no constitutional violation occurred." Instead, they rely exclusively on the second prong of the qualified immunity defense, asserting that the right at issue was not clearly established at the time that Mayor Scott unlawfully terminated the Plaintiffs' employment. "A constitutional right is clearly established when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Durham*, 737 F.3d at 303 (cleaned up) (quoting *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006)). "To ring the 'clearly established' bell, there need not exist a case on all fours with the facts at hand. In other words, 'the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent the denial of qualified immunity.'" *Hunter*, 789 F.3d at 401 (quoting *Edwards*, 178 F.3d at 251).

17

**A. Fourth Circuit and Maryland law are clear about when to apply** Elrod/Branti *versus* Pickering *to alleged violations of public employees' First Amendment rights.*

Defendants argue that the right at issue in this case was not clearly established because "[t]here is a question as to" whether the alleged constitutional violations should be analyzed under the *Elrod/Branti*[4] framework or the *Pickering*[5] balancing test. Def. Mem. 8. But the law in this Circuit is clear: *Elrod/Branti* applies to public employees who are terminated based on their constitutionally protected right to association; *Pickering* applies to public employees who are terminated based on their constitutionally protected right to speech and/or expressive conduct. *See McCaffery v. Chapman*, 921 F.3d 159, 164 (4th Cir. 2019) (explaining the distinct applications of the *Elrod/Branti* doctrine versus the *Pickering-Connick* doctrine); *see also Borzilleri v. Mosby*, 874 F.3d 187, 190–95 (4th Cir. 2017) (analyzing plaintiff's claim that her "firing violated her First Amendment right to free association" under *Elrod/Branti* and her claim that her "firing constituted retaliation for expressing a political opinion in violation of her First Amendment right to free speech" under *Pickering*); *Bland*, 730 F.3d at 374 (Claims that public employees were discharged "because of their political beliefs and affiliation … must be analyzed under the principles established by *Elrod* … and *Branti* … .").

Defendants attempt to cast doubt on this well-established analytical framework by citing to *Newell v. Runnels*, 407 Md. 578 (2009). As an initial matter, this decision from the Supreme Court of Maryland, which predates *McCaffery*, *Borzilleri*, and *Bland*, does not call into question the Fourth Circuit's more recent jurisprudence on this issue as explicated in those federal cases. Regardless, *Newell* is equally clear about the distinct applications of *Elrod/Branti* versus

---

[4] *Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980).

[5] *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

*Pickering*:

> [T]here are two tests used to determine whether a government employer lawfully discharged an employee for exercising her or his political rights: the *Pickering* test and the *Elrod/Branti* test. The former, which applies when the aggrieved employee was discharged allegedly for engaging in speech or expressive conduct, derives from the Supreme Court's decision in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); the latter, which applies when the employee was discharged allegedly for political patronage reasons, comes from the Supreme Court's decisions in *Elrod v. Burns*, 427 U.S. 347 (1976) and *Branti v. Finkel*, 445 U.S. 507 (1980).

*Newell*, 407 Md. at 610; *see also id.* at 622 ("[T]he *Pickering* test applies where a discharged

employee maintains that speech or expressive conduct 'played a role' in the employer's decision

to fire the employee. … [T]he *Elrod*/*Branti* test continues to apply 'only to a set of facts that, as

a threshold matter, show political patronage as the *sole motive* of a discharge.'" (citations

omitted) (quoting *O'Leary v. Shipley*, 313 Md. 189, 205–06 (1988))).

Nor is there a question, as Defendants claim, in either the federal or state jurisprudence,

about whether *Elrod*/*Branti* applies even when the terminated employees belong to the same

political party as the employer. *See Bland*, 730 F.3d at 374 ("These cases make clear that the

First Amendment generally bars the firing of public employees 'solely for the reason that they

were not affiliated with a particular political party **or candidate**[.]'" (emphasis added) (quoting

*Knight v. Vernon*, 214 F.3d at 544, 548 (4th Cir. 2000))); *Newell*, 407 Md. at 622 ("[W]e now

extend the meaning of political patronage beyond firings based on party affiliation to encompass

all situations where a public employer elevates political support to a job requirement[.]").

Thus, both the federal and state caselaw are clear about the analysis to be applied to

Plaintiffs' claims in this case: To the extent that their terminations were based on their

(perceived) associations with the Mayor's political opponents and/or disloyalty to the Mayor,

their claims must be analyzed under the *Elrod*/*Branti* framework; to the extent that their

terminations were based on protected speech and/or expressive conduct, their claims must be

analyzed under the *Pickering* balancing test.

In the Complaint, Plaintiffs have alleged that their terminations were motivated by both their protected right to association and their protected speech and/or expressive conduct. *See* Compl. ¶ 109 ("Plaintiffs engaged in conduct protected by the First Amendment (incorporated through the Fourteenth Amendment) by associating for political purposes while running for public office and speaking on matters of public concern in connection with their political campaigns."). Thus, this Court must apply both the *Elrod*/*Branti* framework and the *Pickering* balancing test, respectively, to their claims.

### B. Under **Elrod/Branti**, *Mayor Scott violated Plaintiffs' clearly established right to associate for political purposes by terminating Plaintiffs' employment.*

"In *Elrod*, a plurality of the Supreme Court established the general rule that dismissing public employees for political affiliation violates their First and Fourteenth Amendment rights by limiting their political belief and association. However, the Supreme Court simultaneously carved out a narrow exception to this general rule prohibiting patronage dismissals." *McCaffrey*, 921 F.3d at 164. That "narrow exception" permits the government employer to dismiss employees on the basis of their political association if the employer "can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 165 (quoting *Branti*, 445 U.S. at 518).

The Fourth Circuit employs "a two-part test for conducting this analysis." *Bland*, 730 F.3d at 375.

> First, we consider whether "the [plaintiff's] position involve[s] government decisionmaking on issues where there is room for political disagreement on goals or their implementation." If it does, we then "examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation [or political allegiance] is an equally appropriate requirement." The first step of the inquiry requires us to examine the issues dealt with by the employee "at a very high level of generality," while "[t]he

> second step requires a much more concrete analysis of the specific position at
> issue." At the second step, "courts focus on the powers inherent in a given office,
> as opposed to the functions performed by a particular occupant of that office."

*Id.* (alterations in original) (citations omitted). Here, the facts alleged in the Complaint, taken as

true, establish that Plaintiffs' positions were not ones in which political allegiance is an

appropriate requirement for the effective performance of such positions. Therefore, their

terminations violated the clearly established right to associate for political purposes.

For both Plaintiffs, it is clear that political allegiance is not "an appropriate requirement

for the effective performance of the public office involved." *McCaffrey*, 921 F.3d at 165 (quoting

*Branti*, 445 U.S. at 518). As described in the Complaint, Mrs. Settles' job duties as Chief of EAP

included "managing and overseeing confidential, short-term professional counseling services

provided to City employees and their eligible dependents[,]" Compl. ¶ 33, "ensur[ing] that

managers, supervisors, and human resource practitioners received consultative and crisis-related

services to assist them in navigating complex employee-related issues[, and] develop[ing] and

present[ing] training modules related to mental health and substance use." Compl. ¶ 34. None of

these job duties "involve[s] government decisionmaking on issues where there is room for

political disagreement on goals or their implementation." *Bland*, 730 F.3d at 375. Therefore, with

respect to Mrs. Settles, the *Elrod*/*Branti* analysis is easily resolved at step one of the inquiry.

With respect to Mr. Davis, his job duties as Legislative Affairs Manager for DOT

included "managing and executing many of DOT's notable policy efforts[,]" Compl. ¶ 73,

advancing DOT's City Council Bills, Compl. ¶ 74, and responding to inquiries from constituents.

Compl. ¶ 75. Examining "the issues dealt with by [Mr. Davis] 'at a very high level of

generality,'" as is required at step one of the inquiry, *Bland*, 730 F.3d at 375, could lead to the

conclusion that his "position involve[s] government decisionmaking on issues where there is

room for political disagreement on goals or their implementation." *Id.* However, turning to step

two, which "requires a much more concrete analysis of the specific position at issue[,]" *id.*, it becomes apparent that Mr. Davis's position did not resemble that of a policymaker. Instead, as described in the Complaint, Mr. Davis was tasked with "*managing and executing*" DOT's policy efforts, Compl. ¶ 73 (emphasis added); he did not have any say over what those policies were. Therefore, Mayor Scott cannot rely on the *Elrod/Branti* exception to the First Amendment to justify terminating Mr. Davis based on his protected right to association.

In summary, at the time that Mayor Scott ordered the Plaintiffs' terminations in June 2024, it was clearly established in this Circuit that Plaintiffs had a right to associate for political purposes, and that terminating their employment violated that right. Therefore, Mayor Scott is not entitled to qualified immunity for violating Plaintiffs' right to associate for political purposes.

### C. Under **Pickering**, *Mayor Scott violated Plaintiffs' clearly established right to protected speech and/or expressive conduct by terminating Plaintiffs' employment.*

The First Amendment's right to freedom of speech generally prohibits dismissals of employees in retaliation for the exercise of protected speech. However, under the *Pickering-Connick* doctrine, the First Amendment does not protect public employees from termination when their free speech interests are outweighed by the government's interest in providing efficient and effective services to the public.

*McCaffrey*, 921 F.3d at 164. Thus, in analyzing whether the government's dismissal of public employees violates the employees' First Amendment rights, "*Pickering* established a balancing test where the government's interest in the efficiency of the public service it performs is weighed against the community's interest in hearing the employees' informed opinions on important public issues." *Id.* at 169 (citing *Borzilleri*, 874 F.3d at 193–94).

There are two threshold issues that must be met to proceed to the balancing inquiry. "First, we determine whether public employees' statements can 'be fairly characterized as constituting speech on a matter of public concern.'" If so, then "we ask whether public employees were speaking 'pursuant to their official duties.'" We must answer the first question in the affirmative and the second in the negative to proceed to the balancing of interests.

*Id.* at 169–70 (citations omitted).

In the Complaint, Plaintiffs have alleged that they engaged in conduct protected by the First Amendment by "speaking on matters of public concern in connection with their political campaigns." Compl. ¶ 109. Specifically, Mrs. Settles "discussed mutual support for" former Mayor Dixon's campaign, displayed her ads on the same advertisement truck as former Mayor Dixon, and distributed former Mayor Dixon's flyers. Compl. ¶ 48. Mr. Davis engaged in protected speech when he announced during his campaign that he was "neutral" regarding the election for Mayor. Compl. ¶ 100. Additionally, both Mrs. Settles and Mr. Davis engaged in expressive conduct protected by the First Amendment when they accepted "financial support from then-Councilman Eric T. Costello[.]" Compl. ¶ 6.

Beginning with step one of the *Pickering* analysis, each of these instances of protected speech and/or expressive conduct "can 'be fairly characterized as constituting speech on a matter of public concern.'" *McCaffrey*, 921 F.3d at 169 (quoting *Borzilleri*, 874 F.3d at 194). Indeed, there can be no debate that speech on issues such as candidates' qualifications for public office is "political speech, which is entitled to the highest level of protection." *Bland*, 730 F.3d at 387; *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) ("Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people."), *cited with approval in Bland*, 730 F.3d at 387. Therefore, Plaintiffs' speech and expressive conduct "clearly related to a matter of public concern." *Bland*, 730 F.3d at 387.

Turning to step two of the *Pickering* analysis, the facts alleged in the Complaint, taken as

true, leave no doubt that Plaintiffs were speaking as private citizens, rather than pursuant to their official duties, when they engaged in the protected speech and expressive conduct described above. *See id.* Both Mrs. Settles and Mr. Davis complied with all City policies regarding conducting any campaign activity during their personal time, not during work hours. Compl. ¶¶ 45, 84–86.

Finally, weighing "the government's interest in the efficiency of the public service it performs … against the community's interest in hearing the employees' informed opinions on important public issues," *McCaffrey*, 921 F.3d at 169 (citing *Borzilleri*, 874 F.3d at 193–94), leads to the inevitable conclusion that Mayor Scott violated Plaintiffs' clearly established First Amendment rights by terminating their employment on the basis of their protected speech and expressive conduct.

> Factors relevant to this inquiry include whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the [agency]; (6) undermined the mission of the [agency]; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the [agency]; and (9) abused the authority and public accountability that the employee's role entailed.

*Bland*, 730 F.3d at 374 (alterations in original) (quoting *Ridpath*, 447 F.3d at 317). Considering the facts alleged in the Complaint, taken as true, each of these nine factors weighs in favor of the Plaintiffs. Importantly, Plaintiffs' speech related to their political campaigns did not cause any disruption to their agencies or hinder their job performance in any way. *See* Compl. ¶¶ 51, 52, 58, 85, 86, 92, 98, 101. Indeed, the City did not even attempt to assert that Plaintiffs' terminations were based on unsatisfactory job performance at the time that they were terminated. *See* Compl. ¶¶ 53, 58, 97.

Therefore, Plaintiffs' rights to speak and to engage in expressive conduct on matters of

public concern were clearly established at the time of their terminations. Accordingly, Mayor

Scott is not entitled to qualified immunity on this claim.[6]

## IV.    Plaintiffs Sufficiently Pled that Their Terminations Violated the Clear Public Policy Allowing Public Employees to Engage in Political Activity and to Express Political Opinions.

Defendants next argue, relying on *Newell*, that Plaintiffs' wrongful termination (also

called abusive discharge) claim must be dismissed because it is duplicative of their claims for

violation of the First Amendment and Article 40 of the Maryland Declaration of Rights. Def.

Mem. 10–11. Again, *Newell* specifically rejects this result.

In *Newell*, like here, the plaintiffs alleged that they were unlawfully terminated from their

public employment in retaliation for exercising their First Amendment rights—specifically, in

that case, campaigning (unsuccessfully) for a candidate for State's Attorney. *Newell*, 407 Md. at

591. The *Newell* plaintiffs, like Plaintiffs here, brought claims for violation of the First

Amendment under § 1983, violation of Article 40 of the Maryland Declaration of Rights, and

wrongful termination/abusive discharge. *Id.* at 602. The *Newell* defendants argued, as do

Defendants here, that the plaintiffs' wrongful termination/abusive discharge claim must be

dismissed as duplicative of their constitutional claims. *Id.* at 640, 642–45. The court

"disagree[d]. Plaintiffs' abusive discharge claim in Count III is not duplicative of their

constitutional claims in Counts I and II." *Id.* at 640.

In reaching that conclusion, the *Newell* court relied on two state statutes "granting public

employees a near absolute right to 'participate in any political activity and express any political

---

[6] At a minimum, whether the First Amendment rights of public employees to associate for political purposes or to engage in protected speech and expressive conduct were clearly established at the time of Plaintiffs' terminations requires further factual development and thus cannot be resolved on a motion to dismiss. *See Newell*, 407 Md. at 635 ("Whether a reasonable State's Attorney should have known that firing Plaintiffs would violate their First Amendment rights to free speech needs to be considered on a more developed record.").

opinion.'" *Id.* at 639 (quoting Md. Code, State Pers. & Pens. § 2-304 (2004) (pertaining to State employees); Md. Code, Art. 24, § 13-103 (2005)[7] (pertaining to local government employees)). The court rejected the defendants' argument that the political activity statutes "merely codify a public employee's right to political speech, consistent with the protections of the First Amendment[,]" instead finding that they "provide public employees with greater protection than that required by the Federal and State Constitutions." *Id.* at 642. Specifically, whereas the Federal and State Constitutions protect "a government employee's right to speak on matters of public concern without fear of reprisal in the workplace … only insofar as her or his interests in engaging in that speech outweighs the possible harm to workplace efficiency and harmony[,]" the political activity statutes "gave public employees a gently fettered right to engage in" political activity and expression of political opinion. *Id.* Therefore, the court concluded that the political activity statutes "provide greater protection than does the *Pickering* balancing test for public employees. Accordingly, Plaintiffs' abusive discharge claim is not duplicative of their constitutional claims[.]" *Id.* at 645.

The *Newell* court then went on to hold that the political activity statutes provide a "clear mandate of public policy" sufficient to support a wrongful termination/abusive discharge claim, and that the court could not say, on the record before it, whether the plaintiffs had another remedy available to them for the defendants' alleged violation of the public policy expressed in the political activity statutes. *Id.* at 648. Therefore, the plaintiffs were permitted to pursue their wrongful termination/abusive discharge claim, as well as their constitutional claims. *Id.*

Here, too, the political activity statute applicable to local government employees provides a "clear mandate of public policy" that Defendants contravened by terminating Plaintiffs. That

---

[7] This statute is now codified as Maryland Code, Local Government Article § 1-303.

statute provides, "Except as otherwise provided in this subtitle, an employee of a governmental entity … may freely participate in any political activity and express any political opinion." Md. Code, Local Gov't § 1-303(1).[8] As alleged in the Complaint, Defendants terminated Mrs. Settles and Mr. Davis because of their "political activity," namely, associating with the Mayor's political opponents and speaking on matters of public concerns as part of their campaigns for public office. *See* Compl. ¶¶ 5–7, 9, 48, 55, 88, 100–01. Thus, Plaintiffs' terminations contravened the clear public policy expressed in the political activity statute.[9]

Furthermore, even if Defendants are correct that the Federal and State Constitutions provide their own remedies for violations of Plaintiffs' rights, this does not foreclose Plaintiffs' wrongful termination/abusive discharge claim premised upon a violation of the political activity statute. *See Magee v. Dansources Tech. Servs.*, 137 Md. App. 527, 568 (2001) ("Recognizing that there may be multiple sources of public policy applicable to a disputed discharge, the [Supreme] Court [of Maryland] held that if at least one public policy mandate arises from a law that does not provide its own remedy, an abusive discharge cause of action may be based on that unremedied violation. Thus, the fact that the same conduct also violates a statute that does

---

[8] Notably, as alleged in the Complaint, the City's Administrative Manual, which "contains official City policies that govern City employees," Compl. ¶ 22, similarly provides that City employees may participate in political processes, run for office, and even maintain their City employment while holding public office, as long as no conflict develops. Compl. ¶¶ 23–24, 26. Most relevant here, the "Administrative Manual also expressly provides that '[a] candidate who is unsuccessful in election to public office may return to their position.'" Compl. ¶ 27 (alteration in original).

[9] Although Plaintiffs, in their Complaint, did not explicitly cite to the political activity statute as a source of public policy, the Supreme Court of Maryland has made clear that plaintiffs asserting a wrongful termination/abusive discharge claim need only identify the "general right" or "perceived policy" that they alleged was contravened by their terminations, not the particular source of that right or policy. *See Porterfield v. Mascari II, Inc.*, 375 Md. 402, 430 (2003). Here, Plaintiffs complied with that requirement by alleging that they "associate[ed] for political purposes while running for public office and sp[oke] on matters of public concern in connection with their political campaigns[,]" Compl. ¶ 124, and that their terminations were "in violation of the clear mandate of public policy favoring freedom of speech and freedom of association[.]" Compl. ¶ 126. Indeed, the Maryland Rules actually prohibit a complaint "from presenting 'technical forms of pleading,' and 'shall not include argument [or] unnecessary recitals of law.'" *Porterfield*, 375 Md. at 430 (citing Md. Rule 2-302(b) (2000)). Thus, to the extent that Defendants might argue that Plaintiffs' wrongful termination/abusive discharge claim should be dismissed "on the basis that the … complaint failed to plead with enough specificity the sources of possible public policy, that argument is incorrect." *Id.*

provide its own remedy will not, by itself, bar the employee's abusive discharge claim."
(citations omitted) (citing *Watson v. Peoples Sec. Life Ins. Co.*, 322 Md. 347, 485–86 (1991))).
Therefore, Defendants' Motion to Dismiss must be denied as to Count III.

### V. Plaintiff Davis Sufficiently Pled the Elements of His Tortious Interference Claim.

Finally, Defendants argue that Mr. Davis's claim for tortious interference with
prospective business relations[10] must be dismissed because he failed to "show an 'unlawful
purpose' on the part of Defendants." Def. Mem. 13. To the contrary, Mr. Davis has pled facts
that, if true, establish each of the elements of his tortious interference claim.[11]

In the Complaint, Mr. Davis alleges that, "during the meeting between MTA
Administrator Arnold and the Mayor's Office in August 2024, Defendants told Ms. Arnold to
instruct RK&K Director of Rail/Transit Mr. Kay not to hire Mr. Davis with RK&K." Compl. ¶
131. Additionally, Mr. Davis specifically alleges that "Defendants' conduct in instructing RK&K
not to hire Mr. Davis was intentional, willful, and calculated to cause damage to Mr. Davis's
lawful business—namely, his prospective employment with RK&K." Compl. ¶ 132. Mr. Davis
further alleges that "Defendants' conduct was perpetrated with the intentional and improper
purpose of causing [such] damage and was without justifiable cause." *Id.* Finally, Mr. Davis
alleges that "Defendants acted with evil motive and intent." *Id.*

These allegations, accepted as true, establish the required elements of Mr. Davis's
tortious interference claim. Essentially, Mr. Davis alleges that the Mayor's Office intentionally

---

[10] In their Memorandum, Defendants incorrectly refer to this as Count V. Def. Mem. 12. Mr. Davis's claim for
tortious interference with prospective business relations appears as Count IV in the Complaint. There is no Count V.

[11] The elements of the tort of tortious interference "are: '(1) intentional and wilful acts; (2) calculated to cause
damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss,
without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and
loss resulting.'" *Yuan v. Johns Hopkins Univ.*, 227 Md. App. 554, 581–82 (2016) (quoting *Kaser v. Fin. Prot. Mktg.,
Inc.*, 376 Md. 621 628–29 (2003)), *affirmed*, 452 Md. 436 (2017).

and willfully instructed RK&K, through Ms. Arnold, not to hire Mr. Davis, despite his undisputed experience and qualifications for the job, with the unlawful purpose of punishing Mr. Davis for his constitutionally protected associations with the Mayor's political opponents during his candidacy for City Council. In their Memorandum, Defendants all but admit that this was the Mayor's motivation for interfering with Mr. Davis's prospective employment when they state that Defendants may have been motivated by "genuine potential concerns about Plaintiff Davis' loyalty after he promised the Mayor's Office that he would express 'continued support' throughout his campaign for the Mayor's policies and efforts but later was heard telling a third party that he was 'neutral' regarding the mayoral election[.]" Def. Mem. 13 (emphasis added) (citing Compl. ¶¶ 87, 100). Clearly, Mr. Davis has alleged facts that, if true, establish that Defendants acted with an "unlawful purpose" in interfering with his prospective employment— and Defendants have apparently conceded that the "unlawful purpose" was to punish Mr. Davis for his perceived disloyalty to Mayor Scott.

Mr. Davis has also alleged that Defendants accomplished their unlawful interference through "improper means." *See Yuan*, 227 Md. App. at 582 ("There must also be proof that the defendant's interference was accomplished through improper means."). Specifically, Mr. Davis alleges that "Defendants used improper means, including but not limited to intimidation, defamation, and/or injurious falsehoods, to prevent Mr. Davis from securing his prospective employment with RK&K." Compl. ¶ 133; *see Spengler v. Sears*, 163 Md. App. 220, 243 (2005) ("The types of unlawful means which have been held to result in liability … are violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." (cleaned up) (quoting *K&K Mgmt., Inc. v. Lee*, 316 Md. 137, 166 (1989))).

Further factual development will establish the precise words and/or actions used by Defendants to accomplish their unlawful interference with Mr. Davis's prospective employment. Nonetheless, at this preliminary stage, the allegations in the Complaint, taken as true, give rise to the inference that the Mayor's Office made false and/or defamatory statements about Mr. Davis's character and/or job performance in order to prevent RK&K from hiring him. Furthermore, given that the City is an important client of RK&K's, the allegations in the Complaint also support the inference that the City may have intimidated RK&K into withdrawing its offer of employment to Mr. Davis by threatening to cancel its contracts with, and/or withhold future business from, RK&K. Therefore, Mr. Davis has satisfied his burden at this stage to "set forth 'enough factual matter (taken as true) to suggest' a cognizable cause of action[.]" *Murphy-Taylor*, 968 F. Supp. 2d at 709.

Finally, Mr. Davis has alleged, and Defendants apparently do not dispute, that Defendants' unlawful interference caused actual damage and loss to Mr. Davis. Specifically, "[a]s a direct and proximate result of Defendants' conduct, Mr. Kay withdrew his job offer to Mr. Davis with RK&K." Compl. ¶ 134. "Additionally, as a result of Defendants' unlawful conduct, Mr. Davis has experienced significant reputational harm. After what happened with his prospective job with RK&K, Mr. Davis has been unable to secure permanent employment for which he is otherwise qualified for fear of further retaliation from Mayor Scott and the City." Compl. ¶ 109.

Accordingly, Mr. Davis has sufficiently pled each of the required elements of his tortious interference claim, and Defendants' Motion to Dismiss must be denied as to that claim.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss.

Respectfully submitted,

_____/s/_____

Timothy F. Maloney (Fed. Bar ID #03381)
tmaloney@jgllaw.com
Kaitlin E. Leary (Fed. Bar ID #31487)
kleary@jgllaw.com
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
301-220-2200
*Counsel for Plaintiffs*

## REQUEST FOR HEARING

Plaintiffs respectfully request a hearing on Defendants' Motion to Dismiss and Plaintiffs'

Opposition.

Respectfully submitted,

_____/s/_____

Timothy F. Maloney (Fed. Bar ID #03381)
tmaloney@jgllaw.com
Kaitlin E. Leary (Fed. Bar ID #31487)
kleary@jgllaw.com
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
301-220-2200
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 14, 2025, a copy of the foregoing was served on all

counsel of record via the Court's ECF system.

_____/s/_____

Kaitlin E. Leary