IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| MARGO SETTLES, *et al.* | * | |
| Plaintiff, | * | |
| | * | Civil Case No.: SAG-25-01838 |
| v. | * | |
| BRANDON SCOTT, *et al.* | * | |
| Defendants. | * | |

**MEMORANDUM OPINION**

Plaintiffs Margo Settles and Liam Davis (collectively, "Plaintiffs") bring this action against Brandon Scott, both in his individual capacity and in his official capacity as the Mayor of Baltimore, and the Mayor and City Council of the City of Baltimore (the "City" and, collectively with Defendant Scott, "Defendants") for claims based on their terminations from City employment. ECF 2. Defendants jointly filed a motion to dismiss, ECF 4, which Plaintiffs jointly opposed, ECF 9. Defendants then jointly filed a reply. ECF 12. This Court has reviewed the filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons explained below, Defendants' motion will be granted in part and denied in part.

I.  **BACKGROUND**

The following facts are derived from Plaintiffs' complaint, ECF 2, and are assumed to be true for purposes of this motion.

Plaintiffs both formerly worked for the City. *Id.* ¶ 1. Plaintiff Settles served as Chief of the Employee Assistance Program, which provides short-term counseling services to City employees and their eligible dependents. *Id.* ¶¶ 30–31, 33. In this role, she was responsible for managing and overseeing these counseling services. *Id.* ¶ 33. She also served as the Chair of the

Violence Assessment Committee throughout her employment, although the complaint does not describe that Committee or her position on it. *Id.* ¶ 37. As pertinent here, she reported to Quinton Herbert, Director and Chief Human Capital Officer of the City's Department of Human Resources. *Id.* ¶ 32. Plaintiff Davis, in turn, served as Legislative Affairs Manager for the City's Department of Transportation. *Id.* ¶ 70. In that role, he was responsible for managing and executing the Department's "policy efforts," advancing its bills before the City Council, and responding to communications that constituents had sent to the Mayor's Office, City Council, and Baltimore City's General Assembly delegation. *Id.* ¶¶ 73–75.

During their City employment, Plaintiffs both decided to run for public office, which City policies expressly permit. *Id.* ¶ 2. Specifically, they both competed in, but ultimately lost, the 2024 Democratic primaries for their respective City Council districts. *Id.* ¶¶ 2–3. Defendant Scott, the Mayor of Baltimore at all times relevant here, publicly endorsed Plaintiff Settles's opponent. *Id.* ¶ 46. Meanwhile, former Mayor Sheila Dixon, who ran against Defendant Scott in the mayoral Democratic primary, did not officially endorse Plaintiff Settles but did coordinate joint advertising with her. *Id.* ¶¶ 6, 48. Additionally, Plaintiffs' respective campaigns received financial support from then-Councilman Eric. T. Costello, a vocal supporter of former Mayor Dixon in her race against Defendant Scott. *Id.* ¶ 6.

On June 21, 2024, five weeks after Plaintiff Davis lost his election, Corren Johnson, the Director of the Department of Transportation, sent him a notice of termination. *Id.* ¶¶ 95, 97. Ms. Johnson told Plaintiff Davis that she could not go into detail regarding his termination, "if you know what I mean." *Id.* ¶ 99. Later that day, Plaintiff Davis spoke with a senior official in the Mayor's Office who informed him that someone in the Mayor's Office had overheard him say

during his campaign that he was "neutral" regarding the mayoral election and that that statement "didn't sit well with" Defendant Scott. *Id.* ¶ 100.

On June 28, 2024, six weeks after Plaintiff Settles lost her election and shortly after receiving a positive performance review, Mr. Herbert and another supervisor informed her that the City had terminated her employment. *Id.* ¶¶ 53–54. Following her termination, Plaintiff Settles learned from a former coworker that at a meeting attended by Deputy Mayor Simone Johnson, the Mayor's Office had directed that Plaintiff Settles be terminated because of her association with Defendant Scott's political opponents. *Id.* ¶ 55. The coworker also informed her that the Mayor's Office gave a similar direction regarding "the guy in transportation." *Id.*

Following Plaintiff Davis's termination, he sought employment with RK&K, a civil engineering company. *Id.* ¶ 103. Given RK&K's contracts with the City, its Director of Rail/Transit wanted to ask the Mayor's Office during an upcoming meeting about any potential issues before hiring Plaintiff Davis. *Id.* ¶ 104. The Director later informed Plaintiff Davis that the Mayor's Office "said no go," and RK&K did not hire Plaintiff Davis. *Id.* ¶¶ 105–06.

## II. LEGAL STANDARD

A defendant is permitted to test the legal sufficiency of a complaint by way of a motion to dismiss. *See, e.g.*, *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Rule 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant

with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). But if a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555.

### III.   DISCUSSION

Plaintiffs bring four claims. In Count I, both Plaintiffs bring § 1983 claims against both Defendants. *Id.* ¶¶ 108–15. In Count II, both Plaintiffs bring claims pursuant to Article 40 of the Maryland Declaration of Rights against both Defendants. *Id.* ¶¶ 116–22. In Count III, both Plaintiffs bring wrongful termination claims against both Defendants. *Id.* ¶¶ 123–29. Finally, in Count IV, Plaintiff Davis brings claims for tortious interference with prospective business relations against both Defendants. *Id.* ¶¶ 130–35. This Court will address each set of claims in turn.

A.  Section 1983 Individual Capacity Claims

Section 1983 provides a cause of action against "any person" who, under color of state law, deprives a person of a constitutional right. 42 U.S.C. § 1983. Defendants argue that these claims should be dismissed because Defendant Scott is entitled to qualified immunity. Qualified immunity shields a government official from civil damages in a § 1983 action if the official's conduct does not violate clearly established law. *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013). In determining whether an official is entitled to qualified immunity, a court must consider (1) whether the official violated the plaintiff's constitutional right and (2) whether the right was clearly

4

established at the time of the alleged conduct. *Id.* A right is clearly established if an objectively reasonable officer in the defendant's shoes would recognize that their conduct violates the right. *Somers v. Devine*, 132 F.4th 689, 696 (4th Cir. 2025).

In their motion to dismiss, Defendants argued only the second prong of this test, contending that a reasonable official in Defendant Scott's position would not have recognized that his conduct was unlawful. Specifically, Defendants argued that the law in this area is unsettled and that it was not sufficiently clear which of two lines of cases applied. This Court will begin by examining those two lines of cases.

First, in *Pickering v. Board of Education*, 391 U.S. 563 (1968), the Supreme Court established a framework for claims involving the alleged dismissal of public employees for their speech. Under this framework, a public employee alleging that dismissal violated his right to freedom of speech must establish that (1) he "was speaking as a citizen upon a matter of public concern," (2) his interest in speaking on that matter outweighed the government's interest in the efficient provision of public services, and (3) the speech was "a substantial factor" in the dismissal decision. *McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998).

Second, in *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980), the Supreme Court considered claims involving the alleged dismissal of public employees because of their political affiliation. Dismissal for failure to support a particular political party or candidate generally violates the First Amendment's freedom of association, but the Court created an exception for political patronage dismissals of employees occupying positions for which party affiliation or political allegiance constitutes "an appropriate requirement for the effective performance of the public office involved." *Bland*, 730 F.3d at 374–75 (quoting *Branti*, 445 U.S. at 518).

To determine whether the exception applies, the Fourth Circuit has established a two-part test. *Id.* at 375. The court must first determine whether the position's duties involve "government decisionmaking on issues where there is room for political disagreement on goals or their implementation." *Id.* (quoting *Stott v. Haworth*, 916 F.2d 134, 141 (4th Cir. 1990)). If it does, then the court must consider "the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other officer holder whose function is such that party affiliation [or political allegiance] is an equally appropriate requirement." *Id.* (quoting *Stott*, 916 F.2d at 142) (alteration in original). This test is concerned only with policymaking, confidential information, and communications that pertain to political concerns. *See Branti*, 445 U.S. at 519 (concluding that facts that public defenders may have made policies pertaining to their clients and were privy to confidential client information had no bearing on this analysis because such policymaking and confidential information did not pertain to partisan political concerns). If the *Elrod/Branti* exception applies such that an official may dismiss an employee for political disloyalty, then the official necessarily may also dismiss the employee for speech that constitutes such disloyalty. *Bland*, 730 F.3d at 394.

This Court discerns nothing unsettled about these governing standards. Indeed, following Plaintiffs' opposition brief, Defendants appear to have abandoned the "unsettled law" argument in their reply, limiting it to an argument that the *Elrod/Branti* exception permitting political patronage dismissals applied to the decisions to terminate Plaintiffs. In doing so, they appear to implicitly argue the first prong of qualified immunity, and, in their arguments on Counts II and Count III, explicitly contend that no constitutional violation occurred. This Court does not condone Defendants raising this argument for the first time in their reply. However, Plaintiffs extensively

6

argued in their opposition that a constitutional violation did occur. Under these circumstances, this Court concludes that it may appropriately address whether the *Elrod/Branti* exception applied.

Regarding Plaintiff Davis, this Court concludes that the *Elrod/Branti* exception applied such that no constitutional violation occurred. Plaintiff Davis served as the Legislative Affairs Manager for the City's Department of Transportation, a position that required him to manage and execute the Department's "policy efforts," advance the Department's bills before the City Council, and respond to constituent communications sent to the Mayor's Office, City Council, and Baltimore City's General Assembly delegation. Plaintiffs acknowledge that this position satisfies the exception's first requirement that the duties involve "government decisionmaking on issues where there is room for political disagreement on goals or their implementation," but argue that Plaintiff Davis only managed and executed policy, rather than made it. The exception, however, is not so limited. Although Plaintiff Davis may not have acted as a "policymaker," he did act as a "communicator," another role that the Supreme Court has described as warranting a political allegiance requirement. Indeed, Plaintiff Davis's responsibilities were closely intertwined with the Mayor's policies. He was responsible for advocating for the Department's, and by extension, the Mayor's, policies in a political setting before the City Council and for communicating with the Mayor's constituents about these issues. Thus, the *Elrod/Branti* exception applied to Plaintiff Davis, and Defendant Scott could lawfully terminate him for both political disloyalty and speech constituting political disloyalty. Plaintiff Davis's § 1983 claim against Defendant Scott in his individual capacity therefore must be dismissed.

This Court reaches a different conclusion, however, regarding Plaintiff Settles. Plaintiff Settles served as Chief of the Employee Assistance Program, which required her to manage and oversee short-term counseling of City employees. Nothing about the management and overseeing

7

of counseling services necessarily suggests that Plaintiff Settles acted as a maker of political policy, holder of confidential political information, or communicator regarding political matters. Based on the complaint, Plaintiff Settles's role resembles those of the public defenders in *Branti* who may have made internal policy and held confidential information, but nothing suggested that that policy or information had any bearing on partisan political concerns. Although Defendants also point to the fact that Plaintiff Settles served as the Chair of the Violence Assessment Committee throughout her employment, the complaint contains no allegations regarding what that role entailed or what work the Committee performed. Discovery may reveal particular aspects of Plaintiff Settles's position that would warrant a requirement of political allegiance, but nothing in the complaint suggests that the *Elrod/Branti* exception applied to Plaintiff or that Defendant Scott could have reasonably concluded that it did. Thus, Defendants have not carried their burden at this early stage to show that Defendant Scott is entitled to qualified immunity, on either prong, as to the decision to terminate Plaintiff Settles. Defendant Scott may raise qualified immunity again at the summary judgment stage.

B. Section 1983 Claims Against the City

Because the *Elrod/Branti* exception applied to Plaintiff Davis, his termination did not violate the Constitution and therefore cannot support a § 1983 claim against the City. Accordingly, that claim will be dismissed, and this Court will turn to Defendants' argument that Plaintiff Settles's § 1983 claim against the City must also be dismissed for failure to allege municipal liability.

Municipalities may be subject to § 1983 liability pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). To establish *Monell* liability, the plaintiff must plausibly allege that the plaintiff's constitutional harm stems from the acts of a municipal

employee "taken in furtherance of some municipal 'policy or custom.'" *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (quoting *Monell*, 436 U.S. at 694); *see also Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987). As interpreted by the Fourth Circuit, a "policy or custom" can exist in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).

Here, Plaintiff Settles primarily argues that she has alleged a policy or custom because her termination constituted a decision by a person with final policymaking authority, namely, Defendant Scott. To satisfy this method of pleading a custom or policy, the decisionmaker must possess authority, as a matter of state law, to establish municipal policy with respect to the decision made. *Riddick v. Sch. Bd. of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000). Even "*a single decision* regarding a course of action in response to particular circumstances" may constitute official policy if the decisionmaker had final policymaking authority. *Hunter v. Town of Mocksville*, 897 F.3d 538, 554 (4th Cir. 2018) (quoting *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999)). Thus, this Court must determine whether Defendant Scott possessed final policymaking authority as to the employment of Plaintiff Settles.

"When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Accordingly, an official may possess authority to make "final implementing decisions" without possessing authority to

make "final policy." *Greensboro Pro. Fire Fighters Ass'n, Loc. 3157 v. City of Greensboro*, 64 F.3d 962, 966 (4th Cir. 1995). A review of cases examining this distinction is instructive.

In *Greensboro Professional Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, a city's Fire Chief allegedly declined to promote the plaintiff because of his union activity. *Id.* at 963. Although the Fire Chief had authority to make promotional decisions, a city ordinance designated the City Manager as the city's "chief personnel officer" and empowered the City Manager to establish "personnel rules, plans, and procedures." *Id.* at 965. One of those personnel rules prohibited discrimination in city employment based on union membership. *Id.* Under these circumstances, the court concluded that the Fire Chief was limited to making implementing decisions "subject to the parameters established by" the officials with final policymaking authority, including the prohibition on discrimination based on union membership. *Id.* at 965–66. Thus, the Fire Chief's decision did not make policy, but rather allegedly violated policy made by others. *Id.* at 966.

Similarly, in *Crowley v. Prince George's County*, although a Police Chief had authority to make personnel decisions, the County Charter empowered the County Council to adopt procedures relating to appointment and removal and required that all personnel decisions be based on merit and fitness. 890 F.2d 683, 686 (4th Cir. 1989). The court concluded that by allegedly demoting an employee based on race, the Police Chief did not make County policy, but rather departed from it. *Id.* at 685, 687.

In contrast, if an official makes a decision unconstrained by parameters set by others or potential for review by others, that decision likely constitutes an exercise of final policymaking authority. *See Hunter*, 897 F.3d at 556–57. In *Hunter v. Town of Mocksville*, a town had no written employment policies and, instead, adopted an ordinance providing:

10

> Town personnel shall be employed by the Town Manager, within the appropriations for that purpose; the terms of the positions shall be at the will of the Town Manager. Fringe benefits shall be as specified from time to time by the Town Manager, subject to the approval of the Board.

*Id.* at 556. The Fourth Circuit concluded that this language delegated to the Town Manager unconstrained authority to define nearly all terms of employment, including those relating to discharge, for town employees. *Id.* at 556–57. The court viewed the fact that the town explicitly reserved authority to approve fringe benefits as further evidence that the Town Manager had authority to make final policy regarding all other employment matters. *Id.* at 560. Furthermore, the town provided no grievance procedure by which discharged employees could contest their discharge, nor any formal process by which the Board could review the Town Manager's termination decisions. *Id.* at 556–57. Given the lack of constraints on the Town Manager's authority, the court concluded that she had exercised final policymaking authority when terminating a town employee. *Id.* at 557; *see also Riddick*, 238 F.3d at 523–24 (concluding that the Superintendent and other school officials did not exercise final policymaking authority because all final personnel decisions, including termination decisions, were subject to review by the School Board).

Here, the Baltimore City Charter (the "Charter") grants the Mayor and City Council some authority over employment matters, *see, e.g.*, City of Baltimore, Md., Charter, art. II, § 55 (authorizing the Mayor and City Council to provide for collective bargaining of City employees), but it contains no sweeping grant of authority to the Mayor and City Council regarding all or most employment matters like those in *City of Greensboro* and *Crowley*. Both Plaintiffs and Defendants focus on Article IV, § 7, which provides, in pertinent part, "The heads of departments . . . shall have the sole power of appointment and removal of all deputies, assistants, clerks and subordinate employees employed by them, subject to the Civil Service provisions of Article VII, unless

11

otherwise provided in the Charter." As pertinent here, those Civil Service provisions prohibit the discharge of Civil Service members based on political opinions or affiliations and provide procedures whereby Civil Service members may contest their discharge. City of Baltimore, Md., Charter, art. VII, § 100(a)(1)–(6).

Based on Plaintiff Settles's allegations, it appears that she was not a member of the Civil Service. Accordingly, her department head, Mr. Herbert, had "sole power" over her removal. That power was unconstrained by the Charter's substantive limitations on removal or the review procedures for Civil Service members. Thus, unlike the officials in *City of Greensboro* and *Crowley* who allegedly violated policies that limited their personnel decisions, Mr. Herbert was bound by no parameters governing his decisions to remove employees like Plaintiff Settles. And like the termination decisions of the Town Manager in *Hunter*, his termination decisions were subject to no grievance procedure or review by any other official. These facts suggest that Mr. Herbert exercised final policymaking authority over terminations of employees like Plaintiff Settles.

Defendants argue that this Court's analysis should end there because if Mr. Herbert had final policymaking authority, Defendant Scott did not. Defendants fail to address, however, that the Charter vests the Mayor with "the power to remove at pleasure all municipal officers," such as department heads like Mr. Herbert. City of Baltimore, Md., Charter, art. IV, § 6(b). The Mayor therefore has the power to order a department head to terminate an employee who is not a member of the Civil Service and to accompany that order with the threat of the department head's removal upon failure to comply. Thus, as a functional matter, the Mayor has unconstrained authority to terminate employees like Plaintiff Settles. Accordingly, at this early stage of the litigation where facts are viewed in the light most favorable to the plaintiff, this Court must conclude that,

regardless of whether department heads also exercise final policymaking authority regarding such terminations, the complaint has sufficiently alleged that Defendant Scott exercised final policymaking authority in allegedly ordering the termination of Plaintiff Settles. And if Defendant Scott acted with final policymaking authority, the City would be liable for his alleged decision to terminate Plaintiff Settles. Her § 1983 claim against the City may proceed.

   C. Section 1983 Official Capacity Claims

Defendants next argue that the § 1983 claims against Defendant Scott in his official capacity must be dismissed as duplicative of the § 1983 claims against the City. This Court will dismiss Plaintiff Davis's claim for the same reason as his other § 1983 claims. Furthermore, this Court agrees with Defendants that Plaintiff Settles's claim also must be dismissed as duplicative. Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell*, 436 U.S. at 690 n.55). If the government entity receives notice and an opportunity to respond, an official capacity suit is treated as a suit against the government entity itself. *Id.* at 166. Accordingly, if a plaintiff brings an identical claim against both a municipal official in his official capacity and the municipality itself, the claim against the official is "redundant." *Corral v. Montgomery County*, 4 F. Supp. 3d 739, 748 (D. Md. 2014) (granting summary judgment in favor of county officials sued in their official capacity under § 1983 because it duplicated § 1983 claim against county that could proceed). Because Plaintiff Settles has brought a § 1983 claim against the City and this Court has concluded that that claim may proceed, her § 1983 claim against Defendant Scott in his official capacity is duplicative and must be dismissed.

    D.  Article 40 Claims

Defendants next argue that Plaintiffs' Article 40 claims must be dismissed. Article 40 of the Maryland Declaration of Rights constitutes Maryland's "constitutional counterpart" to the speech clause of the First Amendment and is generally construed *in pari materia* with it. *See Sammons v. McCarthy*, 606 F. Supp. 3d 165, 199 (D. Md. 2022). Accordingly, Plaintiff Davis's Article 40 claims must be dismissed for the same reason as his § 1983 claims.

Turning to Plaintiff Settles's Article 40 claims, this Court concludes that her claim against Defendant Scott in his official capacity, like her § 1983 official capacity claim, must be dismissed as duplicative of her Article 40 claim against the City. Her other Article 40 claims, however, may proceed. Defendants concede that state officials may not invoke qualified immunity to shield themselves from state constitutional claims. *See DiPino v. Davis*, 354 Md. 18, 51 (1999). Citing *Rovin v. State*, 488 Md. 144, 188 (2024), however, they argue that whether an official acted reasonably may be relevant to whether a constitutional violation occurred and that no violation occurred here. Defendants are correct that *Rovin* stands for the proposition that unreasonableness constitutes an element of some constitutional violations, such as arrest pursuant to a warrant lacking probable cause. However, unreasonableness does not constitute an element of the First Amendment and Article 40 violations alleged here, so *Rovin* is inapposite. Defendants further reference the Local Government Tort Claims Act as a shield against state constitutional claims under certain circumstances but offer no argument regarding its application here. Accordingly, Plaintiff Settles's Article 40 claims against the City and against Defendant Scott in his individual capacity may proceed.

E. Wrongful Termination Claims

Defendants next argue that Count III must be dismissed. Count III alleges common law claims for wrongful termination, or abusive discharge, in violation of public policy. This claim exists as a judicially created exception to the at-will employment doctrine, which permits either party to terminate the employment relationship at any time. *Newell v. Runnels*, 407 Md. 578, 646 (2009). Under this exception, an employer may be liable if the motivation for the termination contravened a clear public policy mandate. *Id.* A constitutional or statutory provision ordinarily supplies the public policy source, but if that or some other provision also supplies a remedy for its violation, then a separate wrongful termination claim will fail. *Id.* at 646, 648.

Here, Plaintiffs cite to Maryland Code, Local Government § 1-303(1) as the source of public policy. That statute provides that a local government employee "may freely participate in any political activity and express any political opinion." Md. Code, Local Gov't § 1-303(1). The Supreme Court of Maryland has recognized this statute as providing greater protection than the *Pickering* test such that it is not duplicative of a constitutional claim. *Newell*, 407 Md. at 645. However, that court has also concluded that the statute does not affect an employer's right to discharge an employee for political patronage if the *Elrod/Branti* exception applies. *Id.*

Because this Court has concluded that the *Elrod/Branti* exception applied to Plaintiff Davis, § 1-303(1) did not prohibit his political patronage discharge. In contrast, because this Court has concluded, at least at this stage, that the *Elrod/Branti* exception did not apply to Plaintiff Settles, § 1-303(1) provided her with greater protection than the First Amendment and Article 40. Section 1-303(1) does not provide a remedy for its violation, so unless Plaintiff Settles had an alternative remedy available to her, her wrongful termination claim may proceed. *See Newell*, 407 Md. at 648 (concluding that viability of wrongful termination claim could not be determined

15

without a more developed record showing whether plaintiffs had an alternative administrative remedy). Similarly, a more developed record is needed here to determine whether Plaintiff Settles had an alternative administrative remedy available to contest her termination and its alleged basis in protected political activity, an issue left unaddressed by the complaint. Thus, dismissal of her wrongful termination claim is inappropriate at this stage.

F. Tortious Interference with Prospective Business Relations Claim

Finally, Defendants argue that Plaintiff Davis's claims for tortious interference with prospective business relations must be dismissed. This tort requires:

> (1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Yuan v. Johns Hopkins Univ.*, 227 Md. App. 554, 581–82 (2016). Furthermore, the defendant must accomplish the interference through improper means. *Id.* at 582. Maryland courts recognize a presumption of good faith when an employer provides a reference regarding a former employee. *Id.* at 583 (concluding that allegation that former employer had made false reference to prospective employer could not overcome presumption of good faith when plaintiff failed to plead who at former employer had done so or what content of false reference was).

Plaintiff Davis has alleged that the Mayor's Office "said no go" regarding his employment at RK&K. He also alleges, upon information and belief, that Defendants used improper means in doing so. And although he further alleges that this conduct was calculated to cause damage to his prospective employment with RK&K and done with that unlawful purpose and without justifiable cause, these allegations merely parrot the elements of the cause of action and are unsupported by any factual allegations. The thin factual allegations provided do not sufficiently raise the inference that Defendants acted with any improper purpose or used improper means to accomplish that

purpose. Indeed, according to the complaint, RK&K recognized in seeking to hire Plaintiff Davis that it had existing contracts with the City, and Defendants persuasively note that the allegations could instead raise the inference that potential for conflicts of interest had motivated the Mayor's Office's statement to RK&K. Furthermore, as in *Yuan*, Plaintiff Davis has failed to allege who from the Mayor's Office "said no go" or what statements, if any, accompanied it. Given the lack of factual allegations, Plaintiff Davis has failed to state a claim for tortious interference with prospective business relations, so Count IV must be dismissed.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss, ECF 4, will be granted in part and denied in part. Plaintiff Settles's claims against Defendant Scott in his official capacity and all of Plaintiff Davis's claims will be dismissed without prejudice. The motion is denied as to Plaintiff Settles's claims against Defendant Scott in his individual capacity and as to Plaintiff Settles's claims against the City. A separate Order follows.

Dated: December 3, 2025                               /s/
                                                      Stephanie A. Gallagher
                                                      United States District Judge